391 S.E.2d 744

**Calvin P. FENTON, et al.**

v.

**Taunja Willis MILLER, et al.**

**No. 19174.**

Supreme Court of Appeals of
West Virginia.

March 29, 1990.

Roger W. Tompkins, Atty. Gen., C. Terry Owen, Sr. Asst. Atty. Gen., Charleston, for Taunja Willis Miller.

Daniel F. Hedges, Charleston, for Calvin P. Fenton.

NEELY, Chief Justice:

Calvin Fenton is a long-suffering, hard working family man who finds himself the subject of efforts by the West Virginia Department of Human Services to collect money that the Department paid to his former wife to support his children.

In the summer of 1977, Patricia Fenton left Calvin Fenton and went to Pennsylvania with another man. Mrs. Fenton left her four children with Mr. Fenton, and he continued to work at his job, arranging for a babysitter when he was working or out-of-town. Mr. Fenton filed for divorce, and in 1978 the Circuit Court of Fayette County awarded the divorce and gave Mr. Fenton custody.

In 1979, however, Patricia Fenton returned to Fayette County, asked for custody, and Mr. Fenton happily sent the children back to her because he was having a hard time caring for them. Mr. Fenton remarried and now has five more children, ages 3, 5, 7, 9, and 10. Furthermore, one of the children from his first marriage has now moved back with him, so he supports a wife and six children on the meager income he earns working for a sign company.

In 1987 the Fayette County Child Advocate office filed a complaint to recoup support (AFDC) money paid by the Depart-

ment to Patricia Fenton. This case is styled *State of West Virginia ex rel. Department of Human Services by Carol T. Lay v. Calvin Fenton.* On 4 March 1987, an Order was entered by the Circuit Court of Fayette County upon an order form provided by the Child Advocate, granting judgment in the full amount of AFDC benefits paid, $11,591. An Order was then entered to pay $350 per month to satisfy the judgment, and Mr. Fenton's wages were garnished.

In December 1988, Mr. Fenton successfully petitioned the Circuit Court of Fayette County for a rule to show cause in prohibition on the grounds that he had not been served with process in the original circuit court action brought by the Child Advocate. The Fayette County Circuit Court stayed the enforcement of the judgment for back support until the service of process issue could be resolved at a hearing on the prohibition proceeding scheduled for 2 February 1989. Before the scheduled hearing, however, the Child Advocate resigned, and the position was left vacant. Thus the hearing was postponed indefinitely, and no hearing has ever been held, although a hearing was rescheduled for the Spring of 1989.

Before the hearing on the Fayette County prohibition proceeding could be had in Spring, 1989, however, Mr. Fenton filed a class action in the Circuit Court of Kanawha County seeking to enjoin the West Virginia Department of Human Services from collecting AFDC payments on behalf of the State until the procedures outlined in *State ex rel. Department of Human Services v. Huffman,* 175 W.Va. 401, 332 S.E.2d 866 (1985), were complied with. The circuit court entered a preliminary injunction, and it is from that circuit court injunction that the Department appeals in the case before us.

### I.

The bone of contention between the appellee, Mr. Fenton, represented by the Appalachian Research and Defense Fund, and the Department concerns the obligation on the part of the Child Advocate to determine the *ability* of a parent on whose behalf AFDC payments have been made to reimburse the State of West Virginia for those payments.

The position of the Department is that the Child Advocate's responsibility is to give notice to the defaulting parent, solicit as much information as possible from the defaulting parent and his employer concerning his income and ability to pay, attempt to achieve a voluntary agreement concerning a repayment schedule, and then, if a voluntary agreement cannot be reached, to bring an enforcement action in the circuit court. The State argues that the Child Advocate essentially represents the State of West Virginia and that the Child Advocate need not concern herself with elaborate hearings and the taking of testimony concerning ability to pay. Rather, the State argues, if a voluntary agreement cannot be reached, it is the circuit court's responsibility to determine ability to pay.

Alternatively, Mr. Fenton maintains that *Huffman, supra,* implies that the Child Advocate must make some initial determination of the debtor parent's ability to pay before petitioning the circuit court. In this case, Mr. Fenton maintains that he informed responsible officials in the Child Advocate's office of his necessitous circumstances, but the Child Advocate nonetheless proceeded to petition the circuit court for a *pro forma* order in the entire amount of the AFDC payments to Mrs. Fenton.

In syllabus point 2 of *Human Services v. Huffman, supra,* we held:

> The Department of Human Services receives only those rights to recoupment of benefits paid under the Aid to Families with Dependent Children Program (AFDC) that an AFDC recipient could assign: the recipient's right to support and maintenance. That right to support and maintenance is dependent upon the ability of the responsible relative to pay, and the determination of ability to pay must be made through an administrative hearing or court proceeding.

As the syllabus point plainly reads, we did not indicate whether the determination of ability to pay should be made by the Department or by the circuit court, but indicated that it could be made at either level.[1]

The case before us is, perhaps, not an ideal vehicle for addressing whether the Child Advocate should listen carefully to what indebted parents have to say about their circumstances and their ability to pay. It became apparent at the oral argument of this case that Mr. Fenton did not use great diligence in seeking out opportunities to discuss his support obligation with the Child Advocate, nor did he attempt to work out a voluntary payment schedule that would have been more reasonable than the $350 per month that the court ultimately ordered him to pay.

But, assuming that Mr. Fenton had appeared before the Child Advocate with copies of his recent income tax returns and had indicated his willingness to make a full financial disclosure, what would the obligation of the Child Advocate have been? The answer to that question is instructed by three considerations: (1) There is a natural tendency in matters of this sort for the debtors to understate and misrepresent their ability to pay, so that, if their representations are taken at face value, the State and Federal governments are unlikely to collect much of the debt that is owed them. (2) If the Child Advocate declines to take the debtor's representations at face value, but has some obligation to make an independent determination of ability to pay, then the Child Advocate is in the business of holding an elaborate "due process" *Huffman* hearing that will duplicate the required circuit court hearing, thus grinding the whole collection process to a halt.

On the other hand, (3) in a large, understaffed, underfunded, overworked bureaucracy like the Child Advocate's office, there is an obvious tendency to treat people in Mr. Fenton's position like meat on its way to dressing and processing. Although technically a person like Mr. Fenton has a right to establish his "ability to pay" in circuit court before a family law master or judge at the enforcement stage, blue-collar workers like Mr. Fenton are unfamiliar with the legal process, unable to afford counsel, and seldom able to obtain a Legal Aid lawyer because of the caseload.

Consequently, some middle ground must be found between requiring the Child Advocate to afford every defaulting parent the full *Huffman* due process hearing that will duplicate what happens in circuit court, and the establishment of a mechanical assembly line to produce default judgments for enormous amounts that can't be paid.

## II.

■ We conclude that the opportunity for the Child Advocate to take the debtor's ability to pay into account occurs at the informal stage of the proceedings, when the defaulting debtor is invited into the Child Advocate office to explain his circumstances and work out an agreement. If the defaulting parent presents to the Child Advocate credible evidence of inability to pay any of the amount owed, that's where the matter should come to rest. However, if the Child Advocate finds the debtor uncooperative or has reason to believe that the information supplied by the debtor or the debtor's employer is not accurate, then the Child Advocate is entitled to file an action to collect the entire amount of the AFDC payments made. In this event, determination of whether the defaulting parent is able to pay is in the hands of the circuit court or the family law master, after notice and a full hearing.

■ We read the Child Advocate enabling statutes as vesting some discretion to the Child Advocate to reach reasonable

---

1. 45 C.F.R. § 302.50 [1984], which we quoted in *Huffman, supra,* sets out the federal requirements for State proceedings for recoupment of AFDC payments. The regulation provides, in pertinent part:

Such obligation (to reimburse the State for AFDC payments] shall be established by:

(1) Order of a court of competent jurisdiction, [or]

(2) Other legal process as established by State laws, such as an administrative hearing process or legally enforceable and binding agreement.

settlements with particular debtors. *W.Va. Code,* 48A–2–8(a) [1986], provides that the Child Advocate office's published guidelines on support obligations "shall be followed by the children's advocate, the family law master and the circuit court," unless the decision maker sets forth written reasons for ruling otherwise in particular cases. The statute also provides: "Notwithstanding the existence of such guidelines, individual cases will still be considered on their own merits." *Id.* The legislature has provided that the Child Advocate's office "has the authority and the means to resolve family law issues fairly and efficiently." *W.Va. Code,* 48A–2–2(a) [1986].

Although the Child Advocate's role in proceedings to recoup AFDC payments is to represent the interests of the State, the Child Advocate has settlement authority. Like any other lawyer with settlement authority, the Child Advocate need not go through the motions of attempting to squeeze blood from a stone when the ultimate result is not in doubt.[2] Thus, like prosecuting attorneys, the Child Advocate is vested with significant discretionary power and should use that discretion wisely.

### III.

After the preliminary injunction in this case was entered in the Circuit Court of Kanawha County and we granted the Department an appeal, Mr. Fenton's counsel, over objection of the Department, moved to disolve the injunction and dismiss the case, and the circuit court granted the motion. If that dismissal were proper, then the case before us would be moot. However, the State asserts that, once jurisdiction of a proceeding has been taken by this court, the circuit court is without jurisdiction to act further in the proceeding. That obviously is the law, so the circuit court's order dissolving the preliminary injunction was erroneous. *Pure Oil Co. v. O'Brien,* 106 W.Va. 10, 144 S.E. 564 (1928).

The initial action of the circuit court in granting the preliminary injunction, however, was also erroneous. Mr. Fenton alleged in his complaint before the circuit court that the Child Advocate office is not complying with the requirements of *Huffman, supra,* because the Child Advocate office does not provide a full and fair opportunity for defaulting parents to present evidence on ability to pay. As we have indicated above, the formal hearing mandated by *Huffman* occurs before a judge or family law master at the circuit court level, when the Child Advocate brings an action to enforce the debt. What we have said above concerning the obligation of the Child Advocate to make a reasonable inquiry into a defaulting parent's ability to pay, *when the defaulting parent is cooperative,* is primarily by way of guidance. Nothing in the law as yet has set up a due-process trap that makes litigation of these matters unending, and we decline to do so now.

For the reasons set forth above, the judgment of the Circuit Court of Kanawha County is reversed.

Reversed.

---

2. Indeed, the Child Advocate office's own rules provide, "In categorizing and setting priorities, major emphasis has been placed on those cases with the most potential for collection." *Policy* *and Procedures of the Child Advocate Office,* § 2800, at p. 50 (W.Va. Dept. of Human Services, 10 January 1989).