# IN THE INTERMEDIATE COURT OF APPEALS OF WEST VIRGINIA

**TIMOTHY D.,**
**Respondent Below, Petitioner**

**v.) No. 24-ICA-416 and 25-ICA-82** (Fam. Ct. Kanawha Cnty. Case No. FC-20-2022-D-711)

**RACHELLE D.,**
**Petitioner Below, Respondent**

**FILED**

**November 21, 2025**

ASHLEY N. DEEM, CHIEF DEPUTY CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

In these two appeals from the Family Court of Kanawha County, Petitioner Timothy D. ("Father")[1] appeals four final orders entered October 8, 2024, January 22, 2025, January 23, 2025, and March 3, 2025, which involve the parties' allocation of custodial responsibility and Respondent Rachelle D.'s ("Mother") relocation.[2] By previous order, we consolidated these appeals for decision.[3]

This Court has jurisdiction over this appeal pursuant to West Virginia Code § 51-11-4 (2024). After considering the parties' arguments, the record on appeal, and the applicable law, this Court finds error in the family court's decisions, but no substantial question of law. Therefore, this case satisfies the "limited circumstances" requirement of Rule 21(d) of the Rules of Appellate Procedure, and it is appropriate to issue a

---

[1] Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See, e.g.,* W. Va. R. App. P. 40(e); *State v. Edward Charles L.,* 183 W. Va. 641, 645 n.1, 398 S.E.2d 123, 127 n.1 (1990).

[2] Father is represented by James M. Pierson, Esq. Mother is self-represented. Morgan M. Switzer, Esq., is the guardian ad litem.

[3] In the appeal docketed as 24-ICA-416, both Father and Mother filed briefs. The GAL filed a summary response in support of the family court's orders. In the appeal docketed as 25-ICA-82, Father filed a brief. The GAL timely filed a summary response in support of the family court's order. Father filed a reply. Mother did not participate in 25-ICA-82.

1

memorandum decision vacating, in part, and reversing, in part, the family court's orders on appeal, and remanding the matter for further proceedings consistent with this decision.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The record on appeal spans the course of two years and numerous hearings, and encompasses a myriad of family court orders, some entered in rapid succession. Father and Mother were married on October 9, 2009, and share two minor children who were born in 2010 and 2016. The parties were divorced by final order entered October 4, 2022, which incorporated the parties' agreed parenting plan providing for a 50-50 allocation of custodial responsibility and following a 2-2-3 parenting schedule.

Less than a year later, on June 22, 2023, Father, by counsel, filed a petition for modification of the parenting plan alleging that Mother was dating a person with a felony criminal record and, contrary to the children's best interests, Mother was allowing the children to spend time around that person.[4] As relief, Father asked the family court to modify the parenting plan to designate him the primary residential parent and legal custodian of both minor children and to grant Mother parenting time with the children every other weekend. Additionally, Father asked the family court to prohibit Mother from allowing contact between the children and the convicted felon.

Mother, by counsel, filed a response to the petition for modification and a counterpetition, in which she sought to reduce Father's parenting time to every other weekend.[5] Further, on August 28, 2023, Mother moved the family court to appoint a guardian ad litem ("GAL") for the children. By order entered September 1, 2023, the family court appointed Morgan M. Switzer, Esq., as GAL for the children and ordered her to interview the parties and the children, prepare a proposed custodial allocation that would be in the best interest of the children, "determine the fitness of the parties and assess the suitability of their home environments for the minor children."

The family court conducted the first hearing following the appointment of the GAL on October 10, 2023. However, the GAL had not filed her report ten days in advance of the hearing as ordered by the family court, and the GAL supplemented it with new information shortly before the hearing. Given such, the family court designated this hearing a "temporary" hearing. The majority of the hearing was devoted to the GAL's testimony

---

[4] Below, Father was represented by different counsel and was briefly self-represented. Mother was represented by counsel below from, at least, August 2023 through October 8, 2024. Thereafter, she was self-represented.

[5] In her counterpetition, Mother alleged that Father: (1) interfered with her contact with the children; (2) made fraudulent allegations of child abuse to Child Protective Services; (3) displayed mental instability and poor decision making; (4) attempted to alienate her from the children; and (5) refused to co-parent with her.

regarding her report and her concerns, including her suspicion that domestic violence had occurred at Father's home, the children not being adequately rested for school while they were in Father's care, and Father's "hostile" messages to Mother through the AppClose text messaging application.[6] The GAL also informed the court of her concerns about Father's "controlling nature," her suspicions that he coached the children, and that Father manipulated the children with gifts and access to their horses. Based upon these concerns, the GAL recommended that the family court temporarily suspend Timothy D.'s parenting time pending a psychological examination. The GAL further recommended that Father attend anger management and domestic violence courses.[7]

Based upon the GAL's testimony, report, and recommendations, at the conclusion of the October 10, 2023, hearing, the family court suspended all of Father's parenting time pending the completion of a psychological examination to be conducted by Dr. Timothy Saar.[8] The court scheduled a second hearing to be held within a month to allow Father time to have the psychological examination. However, following this hearing while still in the courthouse, but outside the courtroom, Father said to the GAL, "You just took my kids from me."

At the next hearing on November 9, 2023, the family court first addressed Father's conduct toward the GAL following the October hearing. Upon inquiry by the family court, the GAL testified that Father made the inappropriate comment to her after the October 10, 2023, hearing while he was paying her his court-ordered share of her fees.[9] The GAL further testified that Father's comment made her "uncomfortable," but that he did not threaten her and that the comment did not make her feel as if she were in any danger. When the family court questioned Father directly about the incident, Father admitted having made the comment, and Father apologized for his conduct. Upon hearing Father's testimony, the family court chastised Father for "jumping [its] guardian." As a sanction for making the inappropriate statement, the family court sua sponte found Father in *criminal* contempt of court pursuant to West Virginia Code § 61-5-26 (1923), sentenced him to a term of five days confinement in the South Central Regional Jail, and fined him $50.00. However, the

---

[6] It is undisputed that Timothy D. never threatened Rachelle D. or the children with physical harm in any of these messages.

[7] Father denied domestic violence occurring in his home. However, Father agreed to take these courses in an effort to regain his parenting time.

[8] The family court's order from this hearing also prohibited Father from going to the children's schools and prohibited both parties from, "directly or indirectly intimidating, retaliating, or influencing any party or witness in this case, including any party referenced in the Report of the Guardian ad Litem, especially the minor children."

[9] At that time, Father and the GAL were inside the courthouse, but not in the courtroom and the family court judge was not present.

3

family court ultimately suspended Father's term of confinement but left the criminal contempt order in place.[10]

At the hearing, Mother and the GAL had no objection to the court granting Father at least supervised visitation with the children. However, the family court ordered that Father's parenting time remain "suspended" until the next status hearing in December of 2023. In its order, the family court also adopted three of Dr. Saar's recommendations from his psychological report: Father must (1) complete anger management counseling and domestic violence counseling; (2) have no decision-making authority over the children until he completes these requirements; and (3) "demonstrate at least three months of stability in his emotions and behaviors, civility in his communications, and restraint in his dealings with the children." Dr. Saar further opined that some form of supervised visitation would be preferable, at least in the early stages of Father regaining his parenting time. The family court adopted Dr. Saar's third recommendation as the benchmark Father would have to meet before the court would reinstate his parenting time. Furthermore, the family court ordered that the children attend individual counseling, "independent of either parent."

The family court conducted another status hearing on December 18, 2023, during which Father, by counsel, alleged that the older child was having attendance issues at school, the older child's grades had dropped since Father's parenting time was suspended, and the children were missing scheduled medical appointments. Mother denied the older child having unexcused absences but testified that she was having difficulty getting the children to all their appointments because of her work schedule, asserting that she had no help because the family court had suspended Father's parenting time. Mother explained to the court that she needed help with children. In response, the family court suggested that

---

[10] As to its finding of criminal contempt, the family court stated the following to Father: "I'll tell you what. I'll suspend execution. Now, what that means is you better, by God, live at the foot of the cross. You better not look crossways at her. You better not say one word about it. If it gets back to me, all I got to do is enter an order and a capias, an order saying I lift the suspension and the capias. And they pick you up and take you up to the South Central Regional Jail, and you will serve five days of criminal [contempt] . . . And you think I'm bluffing you? Please, call my bluff. Please. Do you understand me . . . You better not bad mouth her. If I find out about it, you're gone. You better not jump her and accuse her of taking your kids or you're gone. You say anything nasty to her or any furtive gestures, you're gone. I could send you to jail for ten full days. I could change it. So you better watch what you're doing. . . If you think I'm threatening, you're exactly right. That's exactly what I'm doing. All right. I'll suspend it. Draw that up. I'll suspend it . . . I'm not going to put a date on ending the suspension. If we're still on this case six months from now, that suspension's still hanging over your head. All right. Now, that's criminal contempt. That what I wanted to deal with . . ."

4

she find a solution and noted that it could place the children in foster care if necessary.[11] The GAL recommended that Father be permitted a "trial change in parenting time." The family court adopted the GAL's recommendation and granted Father limited parenting time every other Saturday from 12:00 p.m. to 6:00 p.m., effective December 23, 2023. The family court did not allow Father to take the children to appointments and extracurricular activities even though Mother requested help with the children.

The family court conducted the next status hearing on January 30, 2024. During that hearing, the court and the GAL acknowledged that Father was complying with the court's prior order and was making progress toward regaining his parenting time. Nonetheless, the court ordered that its December 2023 parenting order was to remain in place. The court scheduled the next status hearing for March 28, 2024.

However, prior to the March 28, 2024, hearing, the GAL filed a petition for contempt against Father alleging that Father had instructed the older child not to tell the GAL or Mother about a dispute he had with his ex-wife, encouraged the older child to speak to her former counselor whom the GAL believed was improperly influenced by Father instead of an independent counselor as previously ordered by the family court, communicated with the children directly to arrange visits outside his court-ordered parenting schedule, and appeared at Mother's home with gifts outside his scheduled parenting time,[12] among other things, all in violation of court's various temporary orders. As relief, the GAL asked the court to again "suspend" Father's parenting time in full and order Father jailed for this conduct.[13]

Soon after the GAL filed her petition for contempt, Father, on his own, without the assistance of his counsel, filed a "petition for contempt and judicial misconduct complaint" against the GAL alleging that the GAL had failed to perform her duties, harassed him, retaliated against him, falsified court records by failing to include in her reports information that was beneficial to him, instructed Mother to violate court orders, refused to investigate

---

[11] Prior to Father's parenting time being suspended, he had taken the children to their medical appointments, extracurriculars, equestrian activities, and kept them at his house after school during Mother's parenting time until she got home from work.

[12] Father asked for and received Mother's permission to bring the children's Valentine's Day presents to her house outside his scheduled parenting time.

[13] Mother, by counsel, also filed a motion to again "suspend" Father's parenting time, but as that motion is not included in the appendix record, the grounds for that motion are unknown.

his allegations of parental alienation or to take those allegations seriously, and that the GAL's actions toward him demonstrated bias and were politically motivated.[14]

At the March 28, 2024, status hearing, the family court addressed both petitions for contempt and Mother's motion to suspend Father's parenting time. The court allowed Father to briefly speak to his petition and the GAL to orally respond.[15] Upon hearing testimony from Father, the court expressed that it was displeased with Father's petition and the allegations he made against the GAL. Further, the court noted on the record that it "was aware" Father had filed a separate complaint against the GAL with the West Virginia Office of Disciplinary Counsel ("ODC") separate from his petition for contempt, and the court had received a copy of the same.[16] The family court also noted its displeasure with Father for attaching to his ODC complaint unredacted copies of documents filed in the family court action containing confidential information.

As to Father's petition for contempt against the GAL, the court questioned Father directly about the allegations he made against the GAL, and upon the court's comparison of the petition with Father's earlier pro se filings, the court surmised that Father did not compose his petition on his own. The court demanded that Father identify the alleged individual who either drafted or assisted him in drafting the document. However, Father denied having any assistance and explained that he was taking paralegal courses and had drafted the document on his own. In response, the court stated, "I don't believe you" and that Father was not "that accomplished."

Because Father "refused" to disclose to the court the identity of the alleged person who drafted or assisted him in drafting the petition, the family court again sua sponte found Father to be in direct criminal contempt of court pursuant to West Virginia Code § 61-5-26

---

[14] This pleading is not included in the appendix record; however, the March 28, 2024, hearing recording is included, as is the "fifth temporary order," and from those, these allegations were gleaned. Under West Virginia Code § 51-2A-8(c), "[h]earings before a family court shall be recorded electronically." W. Va. Code § 51-2A-8(c). Unless otherwise ordered by the court, the preparation of any transcript from the electronic recording is the responsibility of the parties. *Id.*; W. Va. R. Prac. & Proc. for Fam. Ct. 5(c). Absent a transcript, the electronic recording is the official record of a hearing. *See* W. Va. Code § 51-2A-8(d).

[15] While the family court found that Father "presented no tangible evidence, offered no witnesses, and failed to produce any support whatsoever to prove his claims against the GAL," as stated in the "Fifth Temporary Order," the hearing recording reflects that Father informed the court that he had witnesses. Nonetheless, the court did not grant him the opportunity to question them.

[16] It is not evident from the record on appeal how the family court became aware of or received a copy of the ODC complaint.

(1923).[17] The court further ordered that to purge himself of criminal contempt and to avoid further sanctions, such as ten days incarceration in the regional jail, Father was required to disclose the identity of the party or parties involved in drafting his contempt petition.[18]

---

[17] During the hearing, the family court announced that it found Father in "direct criminal contempt." However, the order entered April 9, 2024, does not include the word "criminal." Nonetheless, the family court's order references West Virginia Code § 61-5-26 reflecting that the court found Father in criminal contempt.

[18] The family court repeatedly held Father in criminal contempt during various hearings below, all of which were related to his interactions with the GAL and not Mother or the children, and referenced criminal contempt in numerous orders. The family court does not have the express statutory power to hold a party in criminal contempt pursuant to West Virginia Code § 61-5-26, sua sponte or otherwise. West Virginia Code § 61-5-26 states as follows:

> The courts and the judges thereof may issue attachment for contempt and punish them summarily only in the following cases: (a) Misbehavior in the presence of the court, or so near thereto as to obstruct or interrupt the administration of justice; (b) violence or threats of violence to a judge or officer of the court, or to a juror, witness, or party going to, attending or returning from the court, for or in respect of any act or proceeding had, or to be had, in such court; (c) misbehavior of an officer of the court, in his official character; (d) disobedience to or resistance of any officer of the court, juror, witness, or other person, to any lawful process, judgment, decree or order of the said court. No court shall, without a jury, for any such contempt as is mentioned in subdivision (a) of this section, impose a fine exceeding fifty dollars, or imprison more than ten days. But in any such case the court may impanel a jury (without an indictment or any formal pleading) to ascertain the fine or imprisonment proper to be inflicted, and may give judgment according to the verdict. No court shall impose a fine for contempt, unless the defendant be present in court, or shall have been served with a rule of the court to show cause, on some certain day, and shall have failed to appear and show cause.

West Virginia Code § 51-2A-9 expressly grants a family court power over civil contempt matters. However, if a party in a family law matter alleges criminal contempt or the court decides to treat a contempt matter as such, the case shall be tried in the circuit court before a jury. *See* W. Va. Code § 48-1-304(a); Syl. Pt. 8, *In re Frieda Q.*, 230 W. Va. 652, 742 S.E.2d 68 (2013), *overruled, in part, by State ex rel. Dilly v. Hall,* 250 W. Va. 155, 902 S.E.2d 487 (2024). Accordingly, the family court acted outside the scope of its authority when it held Father in criminal contempt. Thus, any provisions of the family

After addressing Father's petition for contempt, the family court stated that it had received a letter dated March 21, 2024, from the Office of the West Virginia Secretary of State asking the court to provide it a copy of Father's petition for contempt against the GAL in connection with its investigation into possible election law violations.[19]

The fifth temporary order resulting from the March 28, 2024, hearing reflects that the court found and concluded, in part, the following regarding Father's petition for contempt against the GAL:

> Thus, after hearing [Father]'s testimony regarding his Petition against the [GAL] and the [GAL]'s response, this Court FINDS that said Petition is a "travesty," "an abuse of process," and a "stain upon the honor of the court system" and that it was "improvidently" filed by [Father] against the advice of counsel.

> This Court CONCLUDES that [Father] filed his Petition in an attempt to thwart the Court's Orders by trying to "blackmail out the GAL."

> This Court further CONCLUDES that [Father]'s Petition against the [GAL] in an ". . .egregious, false, slanderous, libelous interference with the functioning of this Court," and was filed by [Father] in an attempt to retaliate against the [GAL] for her recommendations in this case.

> Thus, this Court further CONCLUDES that [Father]'s Petition against the [GAL] is a direct criticism and attack of this Court, as the [GAL] was appointed by this Court to be a fact finder and investigator.

> The Court also FINDS that [Father]'s Petition is unlike any of his numerous *pro se* filings previously pled before this Court due to the structure of the document, the legalese used, and the allegations set forth therein.

> Thus, the Court hereby CONCLUDES that [Father] did not compose the document himself and [the Court] demanded that [Father] reveal to the Court the identity of the individual(s) who assisted him in creating the document.

> [Father] refused to acknowledge that he had outside assistance in drafting the document and maintained that he researched, composed, and submitted the document alone, crediting his "paralegal" studies for the progress in his legal writing skills; thus, this Court FINDS [Father] to be in DIRECT

court's orders entered in the proceedings below finding Father in criminal contempt are hereby reversed.

[19] During the pendency of the action below, the GAL was a candidate for Kanawha County Prosecutor in the primary election. Sometime before the March 28, 2024, hearing, the GAL filed a complaint with the Office of the Secretary of State alleging election law violations in which she named and/or implicated Father.

8

CONTEMPT OF COURT for failure to disclose the identity of the individual or individuals who helped him research, draft, and submit his Petition against the [GAL].

The court further granted the GAL's petition for contempt, finding Father in indirect civil contempt of court for violating its various temporary orders by seeing the children outside his scheduled parenting time, giving them gifts and using their horses to manipulate them, using the horses to "control" the older child's "emotional and psychological state," picking up the older child from Mother's home and taking the child to the horse barn without Mother's permission, by instructing the older child not to tell the GAL or Mother about a fight between Father's ex-wife and Father while the child was present,[20] and acting to "circumvent the previous orders of [the] Court by encouraging [the older child] to contact a counselor previously disallowed by [the] Court," among other things. Given these findings, the family court again suspended Father's parenting time with the children in full, effective immediately. The family court scheduled the next hearing for May 30, 2024, which became day one of the final hearing.

In the weeks between the March 28, 2024, and May 30, 2024, hearings, the GAL sent Father and his counsel several emails in which the GAL accused Father of again retaliating against her personally, and addressed the March 28, 2024, hearing, his parenting time, her election, and his campaigning for her opponent. Both counsel for Father and the GAL presented these emails to the family court during the May 30, 2024, hearing. The following is an excerpt from the May 3, 2024, email presented to the court:

> I am not seeing any changes in behavior that make me feel comfortable that things are moving forward since our last meeting. For example, [Father] is laughing at my mom's political posts about me on Facebook. Though it doesn't bother me, it absolutely doesn't show progress. In fact, it shows regression. . . Every time you try to hurt me, professionally or personally, because of my recommendations in this case, you have failed and have only hurts [sic] yourself and the girls. . .
>
> I provide information to the Secretary of State on a daily basis as a result of the baseless and defamatory allegations on the website, Facebook page, and

---

[20] This incident referred to by the GAL occurred on August 24, 2023. The evidence established that the police officers who were dispatched to the home that day told the GAL that they found no evidence of domestic violence, both Father and his ex-wife told the officers that no domestic violence occurred, the police did not arrest Father or his ex-wife, neither of them sought a domestic violence protective order, no court issued a domestic violence protective order, and law enforcement brought no charges against Father or his ex-wife stemming from whatever occurred that day.

elsewhere. . . Again, I would strongly encourage you to be honest from this point further.

As it relates to your progress, you've ignored me, and I've not gotten to see anything other than the continuing erratic behavior that makes me worry about your mental health. It appears things are continuing to deteriorate, evidenced by your issues with the employees at the SOS. . . *Until you are thinking more clearly and demonstrate impulse control, I can't recommend any type of a different parenting schedule. . . I hope to see some changes soon. I also hope you reconsider how your [sic] handling the SOS investigation.*

(emphasis added).

At the May 30, 2024, hearing, the GAL testified that Father had made no progress in his behavior that would cause her to change her recommendations regarding Father's parenting time and that she continued to believe he was a danger to the children.[21] The parties were unable to conclude on May 30, 2024; therefore, the court continued the matter.

---

[21] Counsel for Father questioned the GAL about the specific things Father had done that made her believe that Father was a danger and noted the following:

Counsel: Other than – but it seems like his conduct that you take issue is really conduct has been – which has continued against you.
GAL: No.
Counsel: Well, looking at the email that you sent him on May 3, 2024 –
[. . .]
Court: Did you author that?
GAL: Yeah. Yes.
[. . .]
Counsel: . . . you sent this email to both me and Mr. [D.]. Correct?
GAL: I did.
Counsel: And indicated you weren't receiving cooperation with Mr. [D.] and that you indicated you have updated me on some things to reach out for the sake of clarity. But we get into that. But I look at the last paragraph . . . ["]Also, just in case it wasn't clear before . . . I provide information to Secretary of State on a daily basis and as a result of the baseless and defamatory allegations on the website, Facebook, and elsewhere. It turns out that stuff is illegal . . . With that I would strongly encourage you to go back to the SOS and tell the truth . . . ["] I guess my question is, what was the necessary—the need to put that in the email?
Court: Let me see that.
[. . .]
GAL: Do you want me to answer?

The family court held the second day of the final hearing on September 17, 2024. At that hearing, the family court conducted the entire direct examination of the GAL, and the court again questioned the GAL about Father's allegations against her. The court asked the GAL if Father's treatment of her affected her recommendations as to his parenting time, and the GAL testified that, "I have not taken that into consideration whatsoever, other than the fact that he is retaliatory in nature . . ." During this final hearing, the family court explained its earlier decision[22] not to remove the GAL as follows:

> I want everybody to know[,] [t]he reason that I kept you on this is not to make you subject to punishment, but nobody—nobody—is going to intimidate me in my decision. Nobody. And nobody will intimidate my guardian ad litem

Court: Yeah, answer because I'll say right now, that seems pretty inappropriate.

GAL: Well, Your Honor, I'll be honest with you. That—this—he has comingled himself into my life. And right now, I'm still dealing with the consequences of that. And I provided information to the Secretary of State about things that happened during the campaign.

Court: I know.

[. . .]

Court: . . .When I just looked at the glance, it looks like you're still combining the two on May 3ʳᵈ.

GAL: Combining the two of what, Your Honor?

Court: The two things. What happened to you personally and the attacks on it. And, you know, your recommendations and things or your perceptions about his fitness or unfitness to parent.

GAL: Your Honor, sitting here under oath, I can tell you I'm not combining the two. My concern I have to – I have to live in these two worlds now dealing with this case. I have to deal with the fact that I am still actively involved in a Secretary of State investigation that includes Mr. [D.]

Court: Okay. Alright. Fine.

GAL: So I can't get away from that. I can't get away from the fact that he has reached out to people that have hurt me and deal with that.

Court: . . . Bottom line. I'm talking now. It colored your judgment.

GAL: No. Not personally.

Court: Has it colored—I mean, these personal things have colored your judgment with regard to recommendations you made to me in this recent report that I just got.

GAL: No.

[22] While it is not mentioned in any of the court's temporary orders, during one of the earlier status hearings, the GAL orally moved the court to release her from serving as GAL in the case. However, the family court decided not to release the GAL.

because that's an extension of this Court and they're appointed under the (inaudible) of this Court and I will not allow it to happen. . . .[23]

Further, upon the family court's inquiry, the GAL explained that she recommended the family court grant Mother primary custody of the children, along with sole decision-making authority, and grant Father eight hours of parenting time with the children each week. When the court asked how the GAL arrived at her recommendation of eight hours of parenting time, or why she recommended limiting Father's parenting time to eight hours as opposed to an overnight, the GAL testified that,

> Your Honor, I don't really know what the answer is here. I'm at a complete loss. I—I am trying to facilitate a relationship between the girls and their father while also protecting both girls because – and that's sort of where I'm getting stuck, because I'm trying to advocate for what they're telling me, which is they miss their father. . . .

The GAL further explained to the family court that the older child recently told the GAL that the older child wanted to see her father and that she wanted "to do week/on, week/off," meaning alternating between her parents' homes one week at a time, which amounts to 50-50 custodial allocation. The GAL, however, testified that she believed allowing the child to spend that much time with Father would be detrimental to the child.[24] Nonetheless, the GAL did not explain her reasoning for her opinion, how 50-50 would be "detrimental," or what she meant by "detrimental."

By final order entered October 8, 2024, the family court granted Mother primary custodial allocation of the two children and full decision-making authority. The order limited Father's parenting time to alternating Wednesdays (3:30 p.m. to 8:00 p.m.) and Saturdays (noon to 8:00 p.m.). This final order further prohibited Father from exercising "any other parenting time, including calls, texts, or FaceTime calls" outside the specified

---

[23] While some of the hearings were accompanied by transcripts in the record, several of the hearings were not. In those instances, where necessary, this Court has transcribed portions of the hearing based on the DVDs provided.

[24] As to the younger child, the GAL testified the child had told the GAL that she wanted to see Father, but given the child's age, they did not discuss a schedule. Still, the GAL testified that she did not think extensive visitation with Father would serve the younger child's best interest.

(alternating Wednesdays and Saturdays) parenting time. Further, the court ordered that there would be "no special schedule regarding holidays, birthdays, or special occasions."[25]

On October 18, 2024, Father appealed the family court's October 8, 2024, final order.[26] This Court docketed that appeal as Case Number 24-ICA-416.[27] Father, pro se, filed his brief on December 13, 2024, in which he asserted that: (1) the family court failed to properly apply the limiting factors in West Virginia Code § 48-9-209; (2) the family court erred when it refused to honor the parties' de facto parenting plan; (3) the family court erred when it refused to remove the GAL due to bias; (4) the family court erred when it ordered that Father pay 75% of the GAL fees; (5) the family court violated Rules 21(c) and 59(b) of the Rules of Practice and Procedure for Family Court due to the length of the proceedings; (6) the family court erred when it held Father in criminal contempt; and (7) the family court erred when it held Father in civil contempt. That same day, Mother, also pro se, filed her response brief, in which she stated that she and Father had been operating under a 50-50 parenting schedule and that it was in the best interest of the children to continue that schedule. Further, Mother requested that this Court reverse the family court's October 8, 2024, order and instruct that a 50-50 parenting schedule be entered.

On December 16, 2024, the GAL filed a petition for contempt in the family court against *both* Father and Mother, alleging that they were violating the family court's October 8, 2024, order, then pending appeal.[28] Specifically, the GAL alleged that Father and Mother were willfully disregarding the family court's October 8, 2024, custodial allocation and parenting order, and had instead reverted to following a 50-50 parenting plan.

On December 17, 2024, the family court issued a rule to show cause compelling Father and Mother to appear before the family court on December 27, 2024, to answer the contempt allegations. Father and Mother appeared on December 27, 2024, as ordered, and the family court heard the GAL's petition for contempt. As reflected in its final contempt

---

[25] As of the second day of the final hearing on September 17, 2024, Father's parenting time with the children had been suspended in its entirety since the March 28, 2024, hearing.

[26] Father was initially self-represented on appeal. However, Father retained James Pierson, Esq., as counsel for his appeal on January 2, 2025.

[27] On December 12, 2024, the GAL filed a motion to dismiss Father's appeal with this Court, arguing that Father failed to comply with the Rules of Appellate Procedure. The motion to dismiss was refused.

[28] The certificate of service attached to the petition for contempt states that the GAL served her petition for contempt on both parents by email through the court's electronic filing system.

13

order entered January 23, 2025, the family court found that both parties "willfully" violated the October 8, 2024, parenting order by resuming 50-50 custodial allocation. Despite this finding, the court, sua sponte, concluded that Mother agreed to deviate from the court's October 8, 2024, order under duress and that Father had "clearly" pressured her into doing so. However, the family court's final order reflects that the court did not explicitly find Father and Mother in contempt. Instead, the court "admonished" both parties for their willful violations, and sanctioned Father. Additionally, this order reflects that during this hearing, the family court, sua sponte, raised concerns about the summary response Mother had filed with this Court in appeal 24-ICA-416, questioned its legitimacy, and concluded that Mother signed that document under duress, and as a result of Father's subtle coercion and undue influence.[29]

The family court further found that based upon the evidence it was not in the best interests of the children to allow the parties to deviate from its October 8, 2024, order, and that the best interests of both children required it to again suspend Father's parenting time in its entirety, effective immediately, and to prohibit him from having any contact with the children. Thus, the family court again modified the parties' parenting plan.[30] Moreover, the court ordered Father to pay $1,000.00 and to post a $500.00 bond, conditioned upon his "faithful observance" of the October 8, 2024, parenting order. The court also issued a no-contact order prohibiting Father and Mother from communicating with one another except in the event of an emergency involving the children, and then, only through AppClose. Also, even though the family court made no findings of fact or conclusions of law regarding contempt or the children being abused, neglected, or in imminent danger, the court ordered these two provisions: (1) "[a]ny further measures of remediation available to this Court pursuant to West Virginia Code § 49-4-302 shall be held in abeyance at this time," and (2) "[a]ll future matters heretofore, based in criminal contempt, are held in abeyance."

On January 17, 2025, Mother, pro se, filed a petition and notice of relocation in the family court seeking an order allowing her to relocate with the two minor children to Ohio. On January 21, 2025, the GAL filed a "Motion in Support of Petitioner Mother's Petition and Notice of Relocation."

---

[29] The family court also found that Father had engaged in the unauthorized practice of law, and informed Father that it would refer that matter to the county prosecutor.

[30] The family court also stated that it would not consider lifting the suspension of Father's parenting time until he demonstrated three months of "stability" as Dr. Saar recommended in his November 2023 report.

Thereafter, the family court entered a purported "Amended Final Order" entered January 22, 2025, nunc pro tunc October 8, 2024, which purported to amend the final order on appeal by including new provisions providing for the payment of the GAL's fees.[31]

On February 17, 2025, Father, by counsel, filed his response in opposition to Mother's petition for relocation and the GAL's motion in support thereof. The following day, Father also filed a motion to remove the GAL and a motion for in camera interview with the older child. On February 19, 2025, and February 20, 2025, the family court conducted a hearing on Mother's petition and notice of relocation. By order entered March 3, 2025, the family court granted Mother's petition for relocation, thus allowing her to relocate with the two minor children to Ohio, effective immediately. In this order, the family court specifically prohibited Father from contacting the children, as previously ordered in the January 23, 2025, final order of contempt, and suspended his parenting time until further order.

Father appealed the family court's March 3, 2025, relocation order to this Court on that same date. This Court docketed the appeal as Case Number 25-ICA-82. On March 5, 2025, the family court entered a "Corrected Order Granting Petitioner Mother's Petition for Relocation," even though its March 3, 2025, final order was already on appeal. By order entered March 13, 2025, this Court limited the scope of the appeal docketed 25-ICA-82 to the family court's March 3, 2025, order, finding that the family court lacked jurisdiction to enter its March 5, 2025, corrected order. In that same order, this Court recognized that the family court had permitted the GAL to disengage in this matter on appeal and remanded to the family court for the limited purpose of expeditiously appointing a new GAL for 25-ICA-82. On March 17, 2025, the family court entered an order reappointing Morgan M. Switzer as GAL for the children.

This appeal ultimately concerns four separate final orders: (1) the final order entered October 8, 2024, which modified the parties' original allocation of custodial responsibility and parenting plan; (2) the purported Amended Final Order entered on January 22, 2025,

_____

[31] On February 3, 2025, Father moved this Court for leave to file an amended notice of appeal in 24-ICA-416 to add the January 22, 2025, and January 23, 2025, orders to his appeal. This Court entered an amended scheduling order in 24-ICA-416 on February 3, 2025, granting the same and setting new filing deadlines for the parties. On February 19, 2025, Father filed a motion for stay of proceedings below with this Court arguing that the family court entered the January 22, 2025, order nunc pro tunc, which amended the order on appeal and was considering Mother's relocation petition while 24-ICA-416 was pending appeal. In his motions, Father expressed concerns about the family court modifying orders that were currently on appeal to this Court. This Court refused Father's motions for stay.

nunc pro tunc October 8, 2024; (3) the final contempt order entered January 23, 2025; and (4) the order granting Mother's petition for relocation entered March 3, 2025.

## II. STANDARD OF REVIEW

In reviewing an order of the family court, we apply the following standard of review:

> When a final order of a family court is appealed to the Intermediate Court of Appeals of West Virginia, the Intermediate Court of Appeals shall review the findings of fact made by the family court for clear error, and the family court's application of law to the facts for an abuse of discretion. The Intermediate Court of Appeals shall review questions of law de novo.

Syl. Pt. 2, *Christopher P. v. Amanda C.*, 250 W. Va. 53, 902 S.E.2d 185 (2024); *accord* W. Va. Code § 51-2A-14(c) (2005) (specifying standards for appellate review of family court orders).

## III. DISCUSSION

On appeal, Father raises eleven assignments of error with respect to the family court's October 8, 2024, January 22, 2025, and January 23, 2025, orders in 24-ICA-416, and four in his appeal of the March 3, 2025, order in 25-ICA-82. We have consolidated and restated these assignments of error where appropriate and have reordered them in accordance with our analysis. *See Tudor's Biscuit World of Am. v. Critchley,* 229 W. Va. 396, 402, 729 S.E.2d 231, 237 (2012) (per curiam) (stating the general proposition that related assignments of error may be consolidated for ruling).

### 1. Jurisdictional Issue Concerning January 22, 2025, and January 23, 2025, Orders

At the outset, we must address the January 22, 2025, order entered nunc pro tunc and the January 23, 2025, order that was to be read "in conjunction with" the October 8, 2024, order. Generally, trial courts lose jurisdiction to amend orders once a final order has been properly appealed. *See* Syl. Pt. 3, *Fenton v. Miller*, 182 W. Va. 731, 391 S.E.2d 744 (1990) ("Once [SCAWV] takes jurisdiction of a matter pending before a circuit court, the circuit court is without jurisdiction to enter further orders in the matter except by specific leave of this Court.").

However, the Supreme Court of Appeals of West Virginia ("SCAWV") has recognized that certain family law matters may constitute an exception to this general rule. *See Allen v. Allen*, 226 W. Va. 384, 701 S.E.2d 106 (2009). In *Allen*, the SCAWV concluded that "[a] family court has continuing jurisdiction to enter, modify or reconsider a child support order . . . notwithstanding the fact that another order in the same case has been appealed to a higher court." *Id.* at Syl. Pt. 5, in part. While *Allen* applies solely to child support, the SCAWV suggested that this exception could possibly be extended to other domestic relations actions, noting that,

16

[w]e can conceive of circumstances where a family court has entered a child support *or other domestic relation order*, and while that order is on appeal . . .a parent's or child's circumstances may have dramatically changed such that a new, prospective child support order is compelled by events . . . there could be allegations of domestic violence, or a party may be contemptuously flouting the family court's rulings and be refusing to pay the child support as ordered. In such circumstances, we cannot accept the appellant's argument that the Legislature intended for the filing of an appeal to automatically deny the family court any authority to address *the best interests of the child.*

*Id.* at 393, 701 S.E.2d at 115 (emphasis added). Here, the family court entered its final order regarding custodial allocation on October 8, 2024. On December 16, 2024, the GAL filed a petition for contempt, a separate action, alleging that both parents were violating the October 8, 2024, final order and seeking to enforce the same. The January 23, 2025, contempt order was based on the parents' deviation from the October 8, 2024, parenting plan. Thus, the factual basis for the GAL's petition for contempt was different from Father's underlying petition to modify and Mother's counterpetition to modify, which were addressed in the October 8, 2024, order. Further, in the case of *Rector v. Ross*, 245 W. Va. 352, 360, 859 S.E.2d 295, 303 (2021), the SCAWV found that a family court had jurisdiction to consider a motion for contempt alleging a party's failure to comply with an order then pending appeal because the family court had not granted a stay of the proceedings before the family court in conjunction with the appeal. Accordingly, in the instant matter, the family court had jurisdiction to enter the January 23, 2025, contempt order.[32]

Next, we will address whether the family court had jurisdiction to enter the January 22, 2025, order entered nunc pro tunc October 8, 2024. The January 22, 2025, order purported to add new provisions regarding the payment of GAL fees. In the GAL's December 16, 2024, petition for contempt, the GAL alleged that Father failed to pay her fees as ordered at the hearing held on September 17, 2024. However, the issue of the GAL's fees was not reduced to writing until the family court entered the January 22, 2025, nunc pro tunc order. The following day, the family court entered an order recognizing that it had found Father in contempt at the December 27, 2024, hearing due to his failure to pay the GAL's fees, but that Father had purged himself of contempt during that hearing. The SCAWV has previously held that, "[a] nunc pro tunc order must be based on some memorandum on the records relating back to the time it is to be effective and such order cannot be entered if the rights of the parties may be adversely affected thereby." *In re*

---

[32] This decision is distinguishable from our refusal to consider the "Corrected Order Granting Petitioner Mother's Petition for Relocation," because the March 3, 2025, order and the corrected March 5, 2025, order were substantively the same and based on the same facts and circumstances.

*Frieda Q.*, 230 W. Va. 652, 660-61, 742 S.E.2d 68, 76-77 (2013), *overruled, in part, by State ex rel. Dilly v. Hall,* 250 W. Va. 155, 902 S.E.2d 487 (2024).

Upon review of the record, the provisions regarding the payment of the GAL fees included in the January 22, 2025, order had not been previously reduced to writing. *See id.* at 661, 742 S.E.2d at 77 (holding that the mental hygiene commissioner did not reduce her findings and conclusions in writing until the nunc pro tunc order was entered and thus, there was no "memorandum on the records relating back to the time [the order was] to be effective"). Moreover, as the order retroactively required Father to pay GAL fees, which had already been the subject of the GAL's motion to hold Father in contempt, it had the potential to adversely affect his rights. *See id.* (finding that order retroactively imposing financial penalty adversely affected party's interest). Therefore, the family court lacked the jurisdiction or authority to issue the January 22, 2025, order[33] entered nunc pro tunc October 8, 2024.[34] Accordingly, the January 22, 2025, order is declared void and will not be further considered herein.

## 2. Final Modification Order – October 8, 2024 (24-ICA-416)

In his appeal of the October 8, 2024, final order, Father argues that the family court erred when it deviated from the statutory presumption of equal custodial allocation without sufficient facts and statutory authority. Related to this argument, Father also asserts that many of the family court's factual findings are contrary to the evidence presented. Father further contends that the family court's analysis of the factors found in West Virginia Code § 48-9-209(f) is flawed because the court based its analysis on misstatements of fact, irrelevant evidence, and the "suspicions" of the GAL rather than the evidence. As such, Father argues that the family court's decision to grant him less than equal custodial allocation was an abuse of discretion. Upon our review, we agree with Father.

West Virginia Code § 48-9-102a states that there is a rebuttable presumption "that equal (50-50) custodial allocation is in the best interest of the child." Further, West Virginia Code § 48-9-102(a) explains that the best interests of the child are facilitated by,

(1) Stability of the child; (2) Collaborative parental planning and agreement about the child's custodial arrangements and upbringing; (3) Continuity of

---

[33] In *Scott v. Newell*, 69 W. Va. 118, 70 S.E. 1092, 1093 (1911), the SCAWV found that the circuit court could enter a nunc pro tunc order despite the pendency of an appeal. Because we find that the family court's January 22, 2025, order was not properly entered nunc pro tunc, we find it unnecessary to address whether this exception to the general rule against a lower court exercising jurisdiction over an order pending on appeal remains viable.

[34] Father's payment of all outstanding GAL fees at the December 27, 2024, contempt hearing, including those incurred as a result of the GAL's appearance at that hearing, rendered this issue moot.

existing parent-child attachments; (4) Meaningful contact between a child and each parent, and which is rebuttably presumed to be equal (50-50) custodial allocation of the child; (5) Caretaking and parenting relationships by adults who love the child, know how to provide for the child's needs, and who place a high priority on doing so; (6) Security from exposure to physical or emotional harm; (7) Expeditious, predictable decisionmaking and avoidance of prolonged uncertainty respecting arrangements for the child's care and control; and (8) Meaningful contact between a child and his or her siblings, including half-siblings.

Moreover, "[u]nless otherwise resolved by agreement of the parents under § 48-9-201 of this code or unless harmful to the child, the court shall allocate custodial responsibility so that, except to the extent required under § 48-9-209 of this code, the custodial time the child spends with each parent shall be equal (50-50)." W. Va. Code § 48-9-206(a) (2022). This Court has previously explained this rebuttable presumption as follows:

> This statute presumes equal (50-50) parenting time for both parents unless the parties agree otherwise. This presumption may be rebutted if the family court finds by a preponderance of the evidence that the arrangement would be harmful to the child, or a provision of West Virginia Code § 48-9-209(f) (2022) requires a different custodial allocation. West Virginia Code § 48-9-206(d) requires that a determination of custodial allocation in a final permanent parenting plan order be based on the presentation of evidence and include specific findings of fact and conclusions of law supporting the determination.

*Jonathon F. v. Rebekah L.,* 247 W. Va. 562, 563, 883 S.E.2d 290, 291 (Ct. App. 2023). West Virginia Code § 48-9-102a also requires that "[i]f the presumption is rebutted, the court shall, absent an agreement between the parents as to all matters related to custodial allocation, construct a parenting time schedule which maximizes the time each parent has with the child and is consistent with ensuring the child's welfare." West Virginia Code § 48-9-209 identifies a nonexclusive list of factors the family court is required to consider when implementing a permanent parenting plan, as well as those factors the family court shall consider "in determining whether the statutory presumption for an equal (50-50) allocation of physical custody has been rebutted." *Id.*

Father's arguments that the family court failed to properly apply West Virginia Code §§ 48-9-102a and 48-9-209 in determining the custodial allocation and Father's parenting time are interrelated. In the final order on appeal, the family court made findings

of fact as to the best interests of the children, based primarily on the testimony of the GAL,[35] that include the following:

> [Father's] disruptive and unpredictable conduct has created an unstable environment for both children, and [Father] has not demonstrated that he can remain (sic) stability for any significant length of time.[36]
>
> Instead of collaborating with the GAL, [Mother], and other individuals involved in these proceedings, [Father] has chosen to continue his retaliatory and accusatory language and actions and has made no progress over the course of the last year.
>
> [Father] has not appropriately collaborated with [Mother] over AppClose regarding the childrens' [sic] needs, and has been "combative, stubborn, and rigid" in his communication style throughout these proceedings.
>
> However, both children have been exposed to emotional harm by [Father], as is reflected throughout all the records relating to this matter.
>
> It is reasonable to conclude that both children will be exposed to additional emotional harm by [Father] if the Court reinstated a 50/50 parenting schedule, evidenced, in part, by [Father's] hostility towards [Mother] and the GAL.
>
> Due to the hostile nature of [Mother] and [Father's] communications and their inability to reach prompt decisions related to the children's immediate and long-term schedules, activities, etc., a more permanent and stable schedule is required.

---

[35] The GAL testified as the primary witness at every hearing. During these hearings, including the two-day final hearing, the GAL testified for nearly the entire hearing with the family court conducting most, if not all, of her direct examination, not counsel of the moving party, or parties. During the final hearing, the court even asked the GAL her opinions as to what, if any, of the West Virginia Code § 48-9-209 limiting factors applied in this case; *the GAL testified that none applied*.

[36] Father's "stability" was a recurring issue in the proceedings below and continues to be in this appeal. The issue of "stability" originated from Dr. Saar's recommendations as stated in his psychological examination report, but in his report, Dr. Saar explained the term's meaning in context, as opposed to the court's order.

As discussed below, these findings, along with many others included in the final order, are conclusory. Nowhere in the order does the family court identify what it means by "disruptive conduct," "emotional harm," what conduct caused "emotional harm," or how Father exposed the children to "emotional harm."[37] Also, these findings reveal that the GAL based her recommendations on how Father interacted with *her*, not merely Mother and the children. Moreover, these findings failed to address that until October 2023, Father had been actively involved in the children's lives, they shared a close relationship, and that the children had expressed to both Mother and the GAL that they loved and missed Father greatly.

Nonetheless, the family court found that Father caused the children "emotional harm" through his AppClose text messages to Mother even though neither of the parties nor the GAL have suggested that the children saw, or were even aware of, the AppClose messages. In fact, the GAL testified during the September 17, 2024, final hearing that she could not "recall a situation where either parent has directly spoken negatively about the other" in front of the children or any instance of Father presenting Mother to the children in a negative light. Also, the GAL admitted that she "did not have any evidence that either parent has outwardly been derogatory against the other one" and that she had "no evidence that either party said anything disparaging in front of the kids or to the kids." Despite this testimony, the GAL went on to testify that, "I do think, and I've said it before, that the children did feel that discord between the parents." It appears from the order that the court ignored the bulk of this evidence and based its findings on the GAL's belief that the children felt discord between the parties. Therefore, we find that the family court's findings that Father caused the children emotional harm through his AppClose messages with Mother are clearly erroneous. Accordingly, the family court's finding on this issue is reversed.

Further, as stated in the final order on appeal, the family court found that, based upon *all* the evidence presented below, four West Virginia Code § 48-9-209(f) factors were relevant to its determination of custodial allocation and allocation of significant decision-making authority, pursuant to West Virginia Code § 48-9-207. The family court found as follows:

> West Virginia Code § 48-9-209(f)(3)(F): This Court finds that the [Father] has not had stable housing situation due to the recent disharmony between [Father] and his most recent ex-wife . . . In fact, evidence presented through prior proceedings proved that [Father] instructed [older minor child] to keep

[37] In its October 8, 2024, order, the family court uses the words "emotional harm"; however, the family court and the GAL used the words "emotional abuse" during the hearings. The record does not suggest that the family court made any report of abuse, or any referral, to Child Protective Services, the circuit court, or the prosecutor as required by Rule 48(a) of the Rules of Practice and Procedure for Family Court.

21

an incident of domestic violence a secret from the GAL, as the incident took place while these proceedings were ongoing.

As it relates to West Virginia Code § 48-9-209(f)(6), and considering all evidence presented during the pendency of these proceedings, [Father] has demonstrated that he cannot cooperate or collaborate with [Mother], and has not made any corrections in terms of reducing his hostile and aggressive communication style with [Mother]; thus, it is not in the best interest of either children [sic] to award [Father] any decision-making authority.

Further, as it relates to § 48-9-209(f)(6), neither parent has been able to amicably communicate as to the schedule of either children as it relates to horseback riding or horseback riding equipment, causing significant anxiety to both children.

As it relates to West Virginia Code § 48-9-209(f)(7), [Father] bears most of the responsibility as it relates to the negative relationship between himself and [Mother] . . . [Father] has consistently blamed [Mother] and the GAL for the custody determinations made by this Court and has acted in such a way that this Court completely suspended his custody [sic] with the children, which has damaged the relationship he had with the children . . . Positive and healthy relationships are of paramount importance to promote the best interest of both children and subjecting them to the discord between their parents would have negative consequences for both children and, ultimately, for both parents.

Father argues that these findings are misleading and contain misstatements of fact. We agree with Father. As to the family court's first finding that Father lacked stable housing, the record on appeal demonstrates that at no time during the proceedings below did Father have an unstable "housing situation." It is undisputed that Father resided in his home throughout the course of the proceedings below, at which the children had also lived prior to October 10, 2023. Here, the family court is apparently referring to what is perceived about Father's homelife situation, not his actual housing situation. *See* West Virginia Code § 48-9-209(f)(3)(F) (the court should consider whether a parent "[d]oes not have a stable housing situation: *Provided*, That a parent's temporary residence with a child in a domestic violence shelter shall not constitute an unsafe housing situation.") To the extent it is relevant, the evidence establishes that Father and his ex-wife were divorced in early 2024, were no longer living together, and had ceased all communication by the date of the final hearing, and that counsel for Father specifically addressed this during the final hearing. Accordingly, the family court abused its discretion in finding West Virginia Code § 48-9-209(f)(3)(F) applicable here. The same is true for the family court's finding of "unstable housing" based upon the GAL's suspicions that a domestic violence incident occurred at Father's home in 2023 and that Father had instructed the older child not to tell the GAL

22

about that incident. This finding had nothing to do with Father's housing situation as of September 17, 2024, when the family court held its final hearing.

The family court's findings as to the factor found in West Virginia Code § 48-9-209(f)(6), regarding "[w]hether the parents cannot work cooperatively and collaboratively in the best interest of the child," also concern Father's AppClose text messages to Mother. The family court found that Father "has demonstrated that he cannot cooperate or collaborate with [Mother]" and that he "has not made any corrections in terms of reducing his hostile and aggressive communication style with [Mother]; thus, it is not in the best interest of either children [sic] to award [Father] any decision-making authority." While the record demonstrates that Father and Mother were largely unable to effectively and civilly communicate through AppClose, the court made no findings as to how Father's AppClose messages to Mother affected the children or their best interests. Again, the children never saw these messages, and there was no evidence that the children were aware of those messages or their contents. Also, the court never revealed the content of these AppClose messages to which it was referring or explained how the messages were "hostile" and "aggressive." As to this point, the court simply stating in the order that it "has entered five (5) temporary orders in this matter prior to the entry of this Final Order" does not rectify these deficiencies.

Further, the family court's findings as to the factor found in West Virginia Code § 48-9-209(f)(7), "[w]hether a parent will encourage and accept a positive relationship between the child and the other parent, including which parent is more likely to keep the other parent involved in the child's life and activities," are conclusory statements and are irrelevant to this factor. Here, the family court found that Father "bears most of the responsibility as it relates to the negative relationship between himself and [Mother]," "has consistently blamed [Mother] and the GAL" for the court's custody decisions, and "has acted in such a way that this Court completely suspended his custody [sic] with the children," which has damaged their relationship. To the extent the family court found that Father's inability to civilly communicate with Mother through AppClose meant that he could not encourage a positive relationship between the children and Mother, this finding is contrary to the evidence. Neither party nor the GAL have suggested that the children saw the AppClose messages, and the GAL testified that she knew of no instance of either Father or Mother speaking ill of each other in front of the children.

Based upon these findings, the family court concluded that,

after weighing factors set forth in West Virginia Code § 48-9-209 by a preponderance of the evidence, the presumptive allocation of 50/50 custody is *denied* because it would be harmful to both children, though more harmful to the eldest child . . . due to her maturity and ability to understand the nature of her parent's relationship and the collateral consequences of said relationship.

(emphasis added). Further, there was no evidence that Father posed any risk of harm to the children. Therefore, we find that the family court abused its discretion by finding that the 50-50 custodial allocation would be harmful to the children and by "denying" the presumption of equal custodial allocation.[38] Further, to the extent the family court based its decision to allocate all decision-making authority to Mother on these findings, that decision, too, was an abuse of discretion and is reversed.

Finally, Father argues that the family court abused its discretion by failing to consider the preferences of the older child in determining custodial allocation and parenting, pursuant to West Virginia Code § 48-9-209(f)(5)(E). We agree with Father. This statutory factor provides as follows:

> In determining whether the presumption for an equal (50-50) allocation of physical custody has been rebutted, a court shall consider all relevant factors including any of the following: (5) Whether an equal (50-50) physical allocation is: (E) Contrary to the firm and reasonable preferences of a child who is 14 years of age or older . . .

The final order is silent as to the older child's preference. However, the family court heard evidence of the older child's preference for custodial allocation and the parenting schedule during the GAL's September 17, 2024, hearing testimony. This was not the first time the older child had expressed a preference to the GAL.[39] As early as the first hearing

---

[38] The order does not expressly state the statutory presumption of equal custodial allocation was rebutted.

[39] In a section of the report titled, "Child's Express Wishes," the GAL stated, in part, the following:

> Initially, [the older child] did not indicate that she wanted to live with one parent over the other . . . Over the past few days, approximately October 4th through 6th, [the older child] told her father and her therapist that she wanted to reside with her father full-time because she does not want to move to Ohio, though there is not a pending petition for relocation before this court . . . There has been mention of [Mother's] wishes . . . to relocate to Ohio, but nothing has been pled to this Court, and I do not anticipate any relocation requests in the future . . . I called [the older child] on October 5, 2023, . . . I asked her if she had any questions or comments for me, and she said she would feel happier if they were not moving back and forth within such a short span of time (i.e. the 2-2-3 schedule). She indicated that the week on week off schedule would make her comfortable and would potentially make her day-to-day life more enjoyable. . . .

in this matter, October 10, 2023, the older child, then thirteen years old, had expressed a preference to reside with Father full-time.

The record demonstrates that the family court did not address the older child's known preferences in determining custodial allocation and parenting, and that is contrary to law.[40] A child's preference can be the sole basis for a modification of a parenting order. West Virginia Code § 48-9-402(b) allows for modifications of parenting plans without there being a substantial change of circumstances "if the modification is in the child's best interest, and the modification (3) [i]s necessary to accommodate the reasonable and firm preferences of a child who has attained the age of 14[.]" W. Va. Code § 48-9-402(b). Although the court did not address West Virginia Code § 48-9-402(b) in the final order and made no finding as to whether a substantial change in circumstances had occurred, this was a modification action. It began with Father's petition for modification of the parenting plan, and the family court's order on appeal modified the parties' original order for custodial allocation.[41]

Moreover, the SCAWV has instructed courts that "[i]n determining the children's best interests, the child's preferences should be considered." *Andrea H. v. Jason R.C.,* 231 W. Va. 313, 319, 745 S.E.2d 204, 210 (2013) (per curiam). Further, the law regarding the issue of a child's preference in matters such as this is well established: to the extent a child who has attained the age of fourteen has stated a firm and reasonable preference as to custodial allocation and parenting schedules, courts are to consider the child's preference when deciding these issues. *See Jonpaul C. v. Heather C.,* 248 W. Va. 687, 694-95, 889 S.E.2d 769, 776-77 (Ct. App. 2023). However, we recognize that the best interests of the child remain the polar star. *See Brooke B. v. Ray,* 230 W. Va. 355, 361-62, 738 S.E.2d 21, 27-28 (2013).

---

[40] Notably, while the record of this appeal contains copies of the GAL's original report prepared in anticipation of the October 10, 2023, hearing, and the two supplemental reports prepared for the May 30, 2024, and September 17, 2024, final hearing, only the original report contains a "Child's Express Wishes" section.

[41] The family court did not address Father's petition for modification in any of the five temporary orders or the final order entered October 8, 2024. While it appears that the family court never issued a ruling on the petition for modification, near the end of the first temporary order entered October 18, 2023, the court ordered the following: "Petitioner [Mother] shall have NO CONTACT with [name of individual], who is not a party to this case, but has been deemed a potential danger by the [GAL] and the Court due to his extensive and concerning criminal record, which includes acts of domestic violence . . . Additionally, [name of individual] shall have NO CONTACT with the children. . . ." Other than this, we can find no other ruling on Father's petition for modification.

For these reasons, we find that the family court abused its discretion by not addressing the older child's stated preference as to custodial allocation and parenting time pursuant to West Virginia Code § 48-9-209(f)(5)(E) or as a modification without a substantial change in circumstances pursuant to West Virginia Code § 48-9-402(b). Accordingly, we remand this matter to the family court with instructions to consider the child's firm and reasonable preferences.

### 3. Final Contempt Order – January 23, 2025 (24-ICA-416)

Next, we turn to the family court's final contempt order. It is undisputed that Father and Mother ceased following the family court's October 8, 2024, custodial allocation and parenting order within a month of its entry and resumed exercising 50-50 custodial allocation. When the GAL learned that the parties were no longer following the family court's October 8, 2024, order, she filed a petition for contempt against both parties. However, in her petition for contempt, the GAL made no allegations regarding the best interests of the children.[42]

Father argues that he and Mother voluntarily agreed to deviate from the October 8, 2024, parenting order, and, as such, the family court was "required to honor the parents['] parenting time agreement unless it found that said agreement was not voluntary or was otherwise harmful to the children."[43] Father further contends that based upon the very

---

[42] As the GAL is expressly charged with only representing the best interests of the children pursuant to West Virginia Code § 48-9-302, it is highly unusual for a GAL to bring a contempt action that makes no allegations regarding the best interests of the children.

[43] West Virginia Code § 48-9-201 states, in pertinent part, as follows:

(a) If the parents agree to one or more provisions of a parenting plan, the court shall so order, unless it makes specific findings that:
(1) The agreement is not knowing or voluntary; or
(2) The plan would be harmful to the child.
(b) The court, at its discretion and on any basis it deems sufficient, may conduct an evidentiary hearing to determine whether there is a factual basis for a finding under subdivision (1) or (2), subsection (a) of this section . . . .

West Virginia Code § 48-9-402 states, in pertinent part, the following:
(a) The court shall modify a parenting plan in accordance with a parenting agreement, unless it finds that the agreement is not knowing and voluntary or that it would be harmful to the child.
(b) The court may modify any provisions of the parenting plan without the showing of the changed circumstances required by § 48-9-401(a) of this

26

definition of "duress," the family court clearly erred by finding that Mother was under duress when she agreed to deviate from the parenting order. Similarly, Father also asserts that the family court erred by finding, sua sponte, that Mother signed the pleading filed with this Court under duress, or as a result of subtle coercion and undue influence or otherwise.[44] Father relies on this definition of "duress":

> that degree of constraint or danger, either actually inflicted or threatened and impending, which is sufficient in severity or in apprehension to overcome the mind and will of a person of ordinary firmness[. . .] The requirements of common-law "duress" have been enlarged to include any wrongful acts that compel a person, such as a grantor of a deed, to manifest apparent assent to a transaction without volition or cause such fear as to preclude him from exercising free will and judgment in entering into a transaction.

*Warner v. Warner,* 183 W. Va. 90, 94, 394 S.E.2d 74, 78 (1990). In *Warner*, the SCAWV also explained that "[t]he modern approach to resolving the issue of duress focuses on the issue of whether an individual has been 'preclude[d] . . . from exercising free will and judgment in entering into a transaction.'" *Id.* (citation omitted). Further, "[t]he individual claiming duress has the burden of demonstrating such allegations of duress by clear and convincing evidence." *Id.* "To invoke undue influence as a means of voiding an executed document, an individual must establish that he had no free will when he signed the document in question." *Id.* (citation omitted).

First, we note that the GAL had the authority to bring a contempt petition against Mother and Father pursuant to West Virginia Code § 51-2A-9(a) as she had not then been released from the case.[45] Further, the record demonstrates that Mother testified during that

---

code if the modification is in the child's best interests, and the modification . . .

(2) Constitutes a minor modification in the plan;
(3) Is necessary to accommodate the reasonable and firm preferences of a child who, has attained the age of 14 . . . .

[44] In addition to our finding that the evidence does not support a finding of duress, we also note that this Court could not find any precedent for a lower court making such a highly unusual finding concerning filings made in an appellate court under similar circumstances.

[45] As indicated in her petition for contempt, the GAL brought her petition pursuant to West Virginia Code § 48-27-901. However, that statute is inapplicable because it concerns only violations of domestic violence protective orders issued pursuant to Chapter 48, Article 27 of the West Virginia Code. No court had issued any domestic violence protective orders involving Mother and Father.

hearing that she willfully and voluntarily signed the pleading filed with this Court, and that she knew what she was signing.[46] Moreover, while Mother confirmed that she did not "author" the pleading, defined by the family court as meaning it contained "[her] words," Mother testified that she told Father what she wanted to say in the filing, and "he put it in legalese." Such is why the specific words in the pleading "were not hers." Mother further testified that Father typed the document, and she signed it. Mother testified that Father had contacted her about filing the document, and it was his idea to file it, but these actions do not constitute clear and convincing evidence of duress, coercion, or undue influence pursuant to *Warner*. Also, it does not change the fact that Mother understood what the document said, and that she willfully and knowingly signed it.[47] Furthermore, Mother never claimed duress, coercion, or undue influence during the December 27, 2024, hearing, nor did the GAL. The family court raised these issues sua sponte.[48]

As to Father's claim that he and Mother entered into an agreement to deviate from the court's October 8, 2024, parenting order, Mother explicitly testified that "the pressure of everything" made her agree to resume 50-50 parenting, not solely pressure from Father. West Virginia Code § 48-9-501(c) provides that "[a]n agreement between the parents to depart from the parenting plan can be a defense to a claim that the plan has been violated, even though the agreement was not made part of a court order, but only as to acts or omissions consistent with the agreement that occur before the agreement is disaffirmed by

---

[46] Even though this was the GAL's petition for contempt, and, as such, she had the burden of proof, the family court elicited nearly all of Mother's testimony during this hearing, but allowed the GAL to briefly "cross-examine" her. The family court elicited all of Father's testimony. The GAL testified during this hearing, and she called no witnesses in support of her petition.

[47] While questioning Mother, the family court stated that it did not believe she was testifying truthfully, then proceeded to read to her select provisions of West Virginia Code § 49-4-302 which pertains to the family court's authority to order the Department of Human Services to take emergency custody of the minor children of parties to a family court proceeding and threatened to take the parties' children and place them into foster care. At no time did either party or the GAL allege or otherwise insinuate that the children were at risk of any harm, in any imminent danger, abused, or neglected. Importantly, this was the second time the family court had threatened placing the children into foster care.

[48] In response to the court's questioning, Mother testified that she signed the document because she needed help with the children, the court's October 8, 2024, order specifically forbade Father from helping her, and the court had denied her earlier request to relocate to Ohio to be near her family who could have provided her the help she needed.

either parent."[49] Father raised this defense during the December 27, 2024, hearing. However, even though Mother never claimed duress, the court, sua sponte, concluded that Mother was under duress when she entered into that agreement, thereby thwarting Father's defense to the petition for contempt. While Mother testified that she initially "fought" Father about resuming 50-50 parenting, this statement alone does not establish duress or that Father inappropriately pressured Mother into the agreement. In fact, Mother's response to Father's brief filed with this Court on March 11, 2025, further demonstrates that she voluntarily agreed with Father to resume 50-50 custodial allocation:

> I was struggling to get the kids to their appointments and court hearings. I had used up all of my PTO and my work was suffering. The girls were upset every time they came home from their dad['s] because they wanted to spend more time with him. I did not have any support and I was wearing down mentally. [Father] started telling me he could help and that we should file an appeal for 50/50. I told him for at least two weeks I did not think that we should do this. After his persistent hounding. Against my better judgment, I agreed.

Consistent with these statements, Mother testified that she agreed to resume 50-50 parenting with Father because she needed help with the children. Mother needed this help because the family court had imposed a parenting order that was wholly unworkable given her work schedule, her inability to secure sufficient time off from work, the children's needs, and her requirements under the court's parenting order. Further, Mother informed the court of such as early as the December 18, 2023, hearing at which time Father's parenting time was suspended. The parenting plans eliminated Father's ability to help Mother with the children at any time outside of his limited parenting time.

As Mother testified below and stated in her summary response filed with this Court, having to miss work for both court and the children's appointments and activities caused her problems at her job. Additionally, as reiterated in her summary response, Mother testified that the children missed their father, the younger child frequently cried and had trouble getting to sleep at night, and Father helped her. Further, until the filing of her petition for relocation, Mother had consistently testified that Father was a good father, he loved the children, and they loved him. Thus, the situation Mother faced caused her to reluctantly agree to resume 50-50 parenting with Father. Accordingly, we find that the family court abused its discretion by finding that Mother agreed to resuming 50-50 custodial allocation under duress.

---

[49] While West Virginia Code § 48-9-501(a) refers to parental complaints to enforce a parenting order, not those brought by guardians ad litem, there appears to be nothing prohibiting a party from raising agreement as a defense to a GAL contempt petition as provided in West Virginia Code § 48-9-201(c).

As we find insufficient evidence of Mother's purported duress when she agreed to resuming 50-50 custodial allocation with Father and there was no evidence that the parents' agreement to equal custody was harmful to the children, the court should have considered the matter "in accordance with" Mother and Father's parenting agreement pursuant to West Virginia Code §§ 48-9-402(a) and 48-9-201(a).

One of the essential functions of the family court is to resolve disputes between litigants. However, when litigants have knowingly and voluntarily entered into a parenting agreement, as Mother and Father did here, the law is clear that unless the agreement is involuntary and/or harmful to the children, the court *shall* make it the parenting order. However, West Virginia Code §§ 48-9-201 and 48-9-402(a) do not require family courts to blindly accept any such agreement. To the contrary, the statutes require family courts to determine if the agreements are voluntary and if they would be harmful to the children. Thus, the family court still has discretion. However, any finding that a parenting agreement is involuntary or harmful to the children must be based upon the evidence before the court. Here, the court's findings were contrary to the evidence presented.

Accordingly, based upon the evidence, the family court abused its discretion by concluding that Mother was under duress when she agreed to deviate from the October 8, 2024, parenting order. Further, to the extent the family court found that Father pressured Mother into signing her response brief filed with this Court, the family court's finding was clearly erroneous. Additionally, pursuant to West Virginia Code §§ 48-9-201 and 48-9-402(a), the family court erred when it rejected Father and Mother's joint agreement to resume 50-50 parenting, which is presumed to be in the best interest of the children. Consequently, the January 23, 2025, final contempt order is reversed.

**4. Final Order Granting Petition for Relocation – March 3, 2025 (25-ICA-82)**

By order entered March 3, 2025, the family court granted Mother's pro se petition for relocation, thus allowing her to move from West Virginia to Ohio and to take the two children with her. On appeal, Father raises several assignments of error, including that the family court erroneously granted Mother's petition for relocation because in reaching its decision, the family court did not address the preference of the older child, then fourteen years old, did not address the children's opposition to the relocation, and based its decision on findings of fact that were unsupported by the evidence.[50] We agree with Father.

---

[50] Before the family court, Father argued that Mother failed to timely file her petition pursuant to West Virginia Code § 48-9-403, improperly filed her petition, the petition was incomplete, and alleged insufficiency of process and insufficient service of process. However, pursuant to the family court's March 3, 2025, order, the family court found that Father waived the defense of insufficient service of process because Father, by counsel, had filed his response to Mother's petition "by general and not special appearance," and that Father could not challenge the same. Father did not raise a challenge to this ruling on appeal; therefore, we will not discuss these arguments further.

On January 17, 2025, Mother filed a petition and notice of relocation with the family court seeking an order granting her permission to relocate to Ohio with the two children. In support of her petition for relocation, Mother selected the following from the list of potential reasons for relocation printed on the form petition for relocation: "to be close to immediate family" and "to protect myself, my children, or another member of my household from significant risk of harm." Mother also alleged that she was seeking to relocate to "protect [herself] and [her] children from further amount[s] of emotional abuse" and alleged that Father could not "control his actions, aggressiveness unless it is his own ideas. He uses money, gifts, horse activities to make up his own rules, orders to manipulate the [children's] emotions to side with him and to choose him over [herself]. This is constant emotional abuse and causes instability for the [children]." Moreover, Mother alleged that on January 15, 2025, an employer in Ohio had offered her a job in her field which would provide her with an increase in pay, and that she had a start date of February 3, 2025, and she attached a copy of the letter detailing the job offer to her petition.[51] In her petition, Mother further indicated that "a hearing date [was] needed immediately" because of the start date, and the children needed to transfer schools. Until filing this petition, Mother had never alleged that Father abused her or the children emotionally or otherwise or posed any risk to their safety and well-being.

On January 21, 2025, the GAL filed a "motion in support of petitioner mother's petition and notice of relocation." In this unusual pleading advocating for Mother, the GAL asked the court to grant Mother's petition for relocation, recounted the history of the parenting plan litigation, the court's recent contempt order, and the court's numerous other orders and findings. Further, the GAL asserted that Father had "retaliated against" the GAL and noted that Father had filed a civil action against her, as well as complaints against her to the Better Business Bureau, and the ODC. The GAL further alleged that Father had become "increasingly hostile" toward the GAL, the court, Mother, and others, including "employees of the Secretary of State's Office." Additionally, in this motion, the GAL opined that Father was "unstable" and alleged that if the court denied Mother's petition for relocation, "the children will be subjected to continued emotional abuse."[52]

---

[51] The employer did not specify a start date in the letter. The employer letter stated that the job offer was contingent on Mother "meeting the job requirements of the position and will expire in 24 hours from [the] date of the letter."

[52] The GAL also dedicated nearly two pages of her motion to expressing in detail her "great concern" over Father retaining counsel of record in this appeal, opining that this representation "ha[d] the potential to add additional pressure to [Mother] because of [counsel's] clear disdain for the GAL and because of his potential to encourage and promote [Father's] misconceptions about the law and the facts of this case, which could put the children in further jeopardy." However, in the entire motion, the GAL only summarily stated an opinion about the relocation and the best interests of the children,

During the relocation hearing held on February 19 and 20, 2025, Father raised the issue of the children's preference on relocation. Mother testified that she did not speak with the children about relocating to Ohio before filing her petition and explained to the family court that the children learned of the potential relocation from their older half-sibling only after Mother had filed her petition.[53] Given the existing no-contact order, Father had not discussed relocation with the children either. The court noted that the GAL was at the hearing to testify about the children's preferences pursuant to this Court's decision in *Kevin R. v. Megan H.*, No. 24-ICA-135, 2024 WL 4591046 (W. Va. Ct. App. Oct. 28, 2024) (memorandum decision), to which the GAL added, "That is why the guardian exists. Your Honor, I'm here to testify." However, soon after making this statement, during the GAL's testimony, the family court asked the GAL to explain the children's preferences about possibly relocating to Ohio, and the GAL stated the following:

> Your Honor, I'd rather not[,] just due to the attorney/client privilege[,] talk about what they would like to do. I think it would actually be unfair. I've actually not asked them whether they'd like to stay here or not. I don't think they should be led to believe they have a choice. I think that would be very unfair to them.

Not only had the GAL just stated that she was there to testify about the children's preferences but also throughout the parenting litigation, the GAL routinely testified about her communications with the children, included a section in her investigation report entitled "Child's Express Wishes," and frequently informed the court of the children's concerns. Thus, the evidence indicated that no one had spoken to the children about the possible relocation.

At the conclusion of evidence, the family court announced that because of Father's challenges to and attitude toward the GAL, the court was not going to consider the GAL's testimony and recommendation in rendering its decision. Instead, the court explained that it was basing its decision on the evidence Mother presented, that being her testimony and job offer letter. At the conclusion of evidence on day two of the hearing, the family court addressed the applicable statutes in detail, noting the evidence the court considered for each, concluded that Mother had proved the necessary elements under West Virginia Code § 48-9-403, and granted Mother's petition for relocation, effective immediately. Therefore, Mother was free to commence her move to Ohio before the entry of the final order on March 3, 2025.

---

asserting that if the children remained in West Virginia, they would be "subjected to continued emotional abuse" by Father.

[53] In her petition for relocation, Mother stated that she had not provided Father with a copy of her petition because she was afraid that he would try to influence the children's preferences.

As to Father's parenting time with the children, the family court found and ordered the following:

> Pursuant to West Virginia Code § 48-9-403(a), this Court recognizes that [Mother's] requested relocation to Ohio, which will be approximately 3 hours from [Father's] home in West Virginia, qualifies as a substantial change in circumstance that would *potentially* impair [Father's] ability to exercise parenting time, though [Father's] parenting time is currently suspended pursuant to this Court's January 23, 2025[,] Final Order of Contempt . . .

> Due to [Father's] contemptuous and abusive behavior, this Court has suspended [Father's] parenting time and has prohibited his contact with the minor children, pending his showing improvement over a three (3) month period, consistent with [Dr. Saar's] report. Thus, pursuant to West Virginia Code § 48-9-403(d)(4), this Court finds it impractical to allocate any parenting time to [Father] and [Father's] previously ordered suspension of parenting time shall be continue[d] at this time.

Regarding the burden of proof for petitions for relocation, this Court has previously explained:

> Under the new version of West Virginia Code § 48-9-403 (2021), the burden rests on the relocating parent to prove that "(A) [t]he reasons for the proposed relocation are legitimate and made in good faith"; "(B) that allowing relocation of the relocating parent with the child is in the best interests of the child as defined in § 48-9-102 of this code"; and "(C) there is no reasonable alternative, other than the proposed relocation, available to the relocating parent that would be in the child's best interests and less disruptive to the child."

*Katherine A. v. Jerry A.*, 248 W. Va. 672, 674, 889 S.E.2d 754, 756 (Ct. App. 2023). West Virginia Code § 48-9-403 further provides that,

> The relocation of a parent constitutes a substantial change in the circumstances of the child under § 48-9-401(a) . . . when it impairs either parent's ability to exercise responsibilities that the parent has been exercising, or when it impairs the schedule of custodial allocation that has been ordered by the court for a parent or any other person . . .

> The court shall attempt to minimize impairment to a parent-child relationship caused by a parent's relocation through alternative arrangements for the exercise of custodial responsibility appropriate to the parents' resources and circumstances and the developmental level of the child.

W. Va. Code §§ 48-9-403(a), (d)(6). Further, a court must consider the best interests of the child criteria as set forth in West Virginia Code § 48-9-102 in reaching its decision on relocation, as previously discussed herein, as well as the firm and reasonable preferences of a child who has attained the age of fourteen. *See Jonpaul C. v. Heather C.,* 248 W. Va. 687, 889 S.E.2d 769 (Ct. App. 2023).

The family court did not address the firm and reasonable preferences of the older child before ruling on Mother's petition for relocation, nor did the family court consider the children's feelings about relocating to Ohio. Based upon the GAL's own 2023 investigation report, Mother had talked about relocation from the start of the litigation below, and the older child had made it clear that she did not want to move to Ohio. Further, as the older child was fourteen years old, the court should have considered her firm and reasonable preference which the older child previously made known in October 2023.

Father also argues that the family court further erred in granting Mother's petition for relocation as it, again, based its decisions on findings of fact that are not supported by the evidence. Specifically, Father asserts that the family court based its decision to grant Mother's petition for relocation finding that "the immediate relocation is necessary in these circumstances to protect the minor children and [Mother] from [Father's] ongoing harassment, abuse, and manipulation, and incessant Court filings, which has been shown throughout the numerous proceedings before this Court . . ." The family court based this finding on the October 8, 2024, parenting order; however, no evidence was presented to suggest that Father abused the children in any way, emotionally or otherwise.

Based on the foregoing, we find that the family court abused its discretion in granting Mother's relocation to Ohio. The March 3, 2025, order is vacated. However, this Court recognizes that the stability of the children is the paramount concern in these matters. Thus, this decision should not be construed to force Mother to quit her job and move back to West Virginia. Instead, on remand, the family court is instructed to maximize Father's parenting time in accordance with the parties' distance.[54] *See* W. Va. Code § 48-9-102a ("If the presumption is rebutted, the court shall ... construct a parenting time schedule which maximizes the time each parent has with the child and is consistent with ensuring the child's welfare.") As discussed more fully above, in crafting the parenting plan, the family court must also consider the firm and reasonable preferences of the children. *See* W. Va. Code § 48-9-402(b)(3), (4).

### 5. The Guardian ad Litem

Father argues that the family court erred by failing to remove the GAL from her appointment due to conflict of interest, appearance of impropriety, and bias, in both his appeal of the October 8, 2024, final modification order (24-ICA-416) and the appeal of the

---

[54] Given this ruling, we decline to address Father's remaining assignments of error as to the family court's order granting Mother's petition for relocation.

March 3, 2025, order granting relocation (25-ICA-82). In both actions below, Father filed pleadings asking the family court to remove the GAL, which the family court denied. Given that Father's claims regarding the GAL are related and addressed in both appeals, for clarity and to avoid unnecessary repetition, we will address Father's arguments regarding the GAL in both appeals together in this section.

The family court appointed the GAL pursuant to West Virginia Code § 48-9-302 to represent "the best interests of the children," and the court properly set forth the guardian's duties and scope of authority in its appointment order. Rule 47 of the Rules of Practice and Procedure for Family Court sets forth the general rules and requirements for the appointment of a GAL, and Appendix B of those rules sets forth the "Guidelines for Guardians Ad Litem in Family Court" all GALs in family court matters are required to follow. Rule 47(c) states, in part, that "[a] court-appointed guardian ad litem's services are provided to the court on behalf of the child," and that "[t]he guardian ad litem acts as an independent fact finder, investigator and evaluator as to what furthers the best interests of the child." Further, the Guideline 13 provides, in part, that "[t]he GAL shall disclose to the court the child's wishes unless the GAL believes such disclosure would jeopardize the child's safety . . ." Guideline 15 states, in part, that "[t]he GAL shall provide the court with sufficient information including specific recommendations for court action based on the findings of the interviews and independent investigation. In cases involving parenting responsibilities, the recommendations shall provide clear and concise requirements of both parents to accomplish the recommendations of the GAL. . . ."

Additionally, the SCAWV has addressed the role of GALs and their duties extensively. In the case of *In re Carol B.*, 209 W. Va. 658, 550 S.E.2d 636 (2001), the SCAWV was faced with allegations that a court-appointed GAL in an abuse and neglect action had a conflict of interest because the GAL had previously represented one of the parties to the action. The SCAWV provided the following guidance:

> Children, in cases like the instant one, have a right to be represented by counsel in every stage of the proceedings. The chief duty of guardians ad litem is to act in the best interests of the children for whom they are appointed. Guardians ad litem must act with competence, reasonable diligence, and promptness. Also, guardians ad litem are to make a full and independent investigation of the facts involved in the proceeding prior to making their recommendations to the court. *See* Syllabus Point 5, *In Re Jeffrey R.L.,* 190 W. Va. 24, 435 S.E.2d 162 (1993) . . .

> We believe, further, that the duties set forth above require guardians ad litem to avoid conduct which reflects adversely on the undivided devotion owed by guardians ad litem to the children they represent. Guardians ad litem, therefore, have an affirmative duty to disqualify themselves following cognizance of good cause and to disclose facts that possibly could disqualify

35

them from representing children in certain instances. *Also, courts should be careful to appoint guardians ad litem who are free from any hint of conflict of interest* . . . we realize that this is not a perfect world and there are no perfect cases. Accordingly, we conclude by emphasizing that our statements are meant to be instructive in future cases . . . .

*In re Carol B.,* 209 W. Va. 658, 667 n.6, 550 S.E.2d 636, 645 n.6 (2001) (emphasis added).

The record of this appeal demonstrates that Father and the GAL had a contentious relationship throughout the litigation below, and it continues on appeal. However, Father argues in his brief that their relationship was already poor at the time of the GAL's appointment on September 1, 2023, because he had supported and campaigned for her opponent when the GAL sought election.[55] As a result of this, Father argues that the GAL was biased against him and recommended the family court grant him minimal parenting time with the children in retaliation for these actions. The GAL has denied bias; however, it is unclear whether the GAL admits that she knew anything about Father when she was appointed.

In her October 10, 2023, investigation report, later supplemental reports, and during hearings, the GAL repeatedly asserted that Father "emotionally abused" the children and Mother, questioned his mental stability, and recommended the court suspend his parenting time multiple times. As to her claims of "emotional abuse," those appear to have been based on nothing more than the GAL's opinion that the children "felt" the discord between their parents. Further, in her reports, the GAL noted her suspicions of domestic violence in Father's home and used this as one of the reasons to justify limiting Father's time with the children, even though the evidence did not support her suspicions and no domestic violence protective orders had been issued.

Additionally, throughout the proceedings below, the GAL frequently accused Father of manipulating the children with gifts, money, and access to their horses, as well as attempting to circumvent the family court's orders. The GAL frequently described Father as being controlling, manipulative, abusive, retaliatory, aggressive, angry, disruptive, unpredictable, and erratic, among other things, during hearings as well as in her various reports and motions. Worse, the GAL regularly asserted that Father was "unstable" and claimed that he was a risk to the children; however, the GAL never defined or explained what she meant by "unstable" or identified any alleged risk he posed. However, it appears the GAL got the word "stability" from Dr. Saar's November 2023 report in which Dr. Saar recommended that Father "demonstrate at least three months of stability *in his emotions and behaviors, civility in his communications and restraint in his dealings with*

---

[55] Father also stated that he was a member of a fraternal organization that normally endorsed a candidate for the prosecutor of Kanawha County, but he opposed the group endorsing the GAL, and that the GAL was aware of the same.

*the children. . .*" Dr. Saar did not refer to Father as being "unstable" in his report. While several orders refer to Dr. Saar's recommendations as justification to suspend or to limit Father's parenting time, the court simply states that Father must complete three months of "stability" before the court would consider reinstating Father's parenting time. The family court did not define "stability," or order specific terms and conditions that Father would have to complete before he could ask for a modification of the parenting order.

The record, however, is clear that until the GAL's involvement in the action below, Father shared equal custodial allocation with Mother. While Father and Mother did not get along well, Mother had not alleged that Father was abusive to her or the children. Further, Mother had not alleged that Father posed any risk of harm or danger to the children, or that he was unstable until she filed her petition for relocation. Further, until the GAL was appointed, Mother allowed the children to spend half of their time, if not more, with Father, and she had no problems with him traveling with the children to the rodeo events, many of which were out of state. Mother had no objections to Father taking the children to appointments, driving the children anywhere, or providing them after school care to help her. Also, during the proceedings below, Mother acknowledged that Father was a good father, that he loved the children, and they loved him.

From the record, it is evident that more than a "hint of a conflict of interest" existed between the GAL and Father that necessitated the appointment of a new GAL. The GAL moved the family court to release her from the case during one of the status hearings, but the family court declined her motion. While the GAL never suggested to the court that she could not be impartial, the GAL cited the "relentless retaliation and personal and professional attacks" and the "awful things" she had been forced to endure at the hands of Father and the negative impact it had had on her. Based upon the record on appeal, and given the SCAWV's instructions in *In re Carol B.*, we find that the family court abused its discretion by not allowing the GAL to withdraw from the case when she requested in or about March 2024, and by denying Father's requests to remove the GAL.[56] Accordingly, the family court is directed to enter orders removing the children's current GAL and appointing another qualified attorney to serve in that capacity within ten days of this decision. The family court shall appoint no attorney with whom the current GAL may now

---

[56] We also note the several unusual actions of the family court below, including the refusal to accept the resignation or to remove a GAL who had a clear conflict of interest, multiple findings of criminal contempt against Father and threatened incarceration without due process, veiled threats against the Mother to influence testimony, and the finding that Mother was under duress when she signed and filed a response brief in the appeal pending before this Court, as well as when she agreed to resume 50-50 custodial allocation with Father.

practice, or formerly practiced, or any relative of the current GAL, to serve as the children's GAL.

## IV. CONCLUSION

For the reasons set forth herein, the family court's October 8, 2024, parenting order is reversed, the January 22, 2025, order is declared to be void and of no effect, and the March 3, 2025, order granting Mother's petition for relocation is vacated, and we remand this matter to the family court for further proceedings including adoption of a new parenting plan order consistent with this decision. Further, the family court's January 23, 2025, final contempt order is reversed as are all findings of criminal contempt against Father by the family court.[57] Due to Mother's relocation, Father's temporary suspension of parenting time and parental decision making shall continue only until a hearing can be held consistent with this decision. This hearing setting a new parenting plan order (even if temporary) shall be held within thirty days of this decision to address Mother's petition for relocation and to determine the appropriate custodial allocation and parenting schedule for the parties that maximizes the parenting time for each parent consistent with West Virginia Code § 48-9-102a. The Clerk of this Court is hereby directed to issue the mandate contemporaneously herewith.

Reversed, in part, Vacated, in part, and Remanded with Directions.

**ISSUED:** November 21, 2025

**CONCURRED IN BY:**

Chief Judge Charles O. Lorensen
Judge S. Ryan White

Judge Daniel W. Greear, not participating

---

[57] Given our decision to vacate and remand on the grounds addressed, we decline to address Father's remaining assignments of error and arguments on appeal.